[Execution]

# SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release (this "**Agreement**") is made and entered into effective as of the 9th day of December, 2015 by and among:

(i) Frontier Pro Services, LLC ("**FPS**"), Cycle Power Services LLC ("**CPS**") and Cycle Power Partners, LLC ("**CPP**" and, together with FPS and CPS, the "**CPP Parties**"), on the one hand, and;

(ii) American Refining and Biochemical, Inc. ("**ARB**"), Frontier Wind, LLC ("**FW**") and Energy Unlimited, Inc. ("**EUI**" and, together with ARB and FW, the "**ARB Parties**"), on the other hand

(each of the foregoing sometimes hereinafter referred to individually as a "**Party**" or collectively as the "*Parties*").

WHEREAS, ARB and the CPP Parties are parties to that certain Investment Agreement and Plan of Reorganization dated June 12, 2015 (the "**Investment Agreement**") pursuant to which, *inter alia*, CPS acquired a majority interest in FPS; and

WHEREAS, pursuant to Section 2(b) of the Investment Agreement, the CPP Parties agreed to pay ARB a post-closing share of net proceeds from FPS operations ("**ARB's Net Share**") during a specified "Measurement Period," in accordance with a formula and on the terms set forth in the Investment Agreement; and

WHEREAS, ARB and the CPP Parties have disagreed on the calculation of ARB's Net Share; and

WHEREAS, following the closing under the Investment Agreement, the CPP Parties have asserted certain claims against ARB relating to intercompany payables and receivables involving FW and EUI, as stated in a "Claim Notice 2015-1" and "Claim Notice 2015-2," both dated August 28, 2015 and communicated to ARB by counsel to the CPP Parties (together, the "**CPP Claims**"); and

WHEREAS, following the closing under the Investment Agreement, FPS continued to use American Express credit cards issued to FPS employees prior to the closing under the Investment Agreement ("**Closing**"), until such time as the CPP Parties could put in place replacement credit cards for the newly reorganized FPS, with the understanding that FPS would timely pay all amounts accrued by FPS under such credit cards post-Closing; and

WHEREAS, as of the date hereof, FPS has not timely paid in full amounts due to American Express under such credit cards, and FPS has accrued an unpaid balance due of approximately $56,000 (the "**Amex Balance**"), for which ARB and its principal shareholder, Harry R. Halloran, Jr. ("**Mr. Halloran**") are potentially liable; and

WHEREAS, following the Closing ARB made available to FPS the services of its employee, Jack Wallace, with the understanding that Mr. Wallace would spend 75% of his time

providing services to FPS, and the CPP Parties would reimburse ARB for amounts in respect of ARB's out-of-pocket costs related to Mr. Wallace's compensation and benefits; and

WHEREAS, Mr. Wallace provided services to FPS from the date of the closing through September 30, 2015 under the forgoing arrangement without a formal agreement, but to date FPS not reimbursed ARB for any of its costs in connection therewith for that period of time. The parties acknowledge the fully executed formal agreement for Mr. Wallace's services dated October 1, 2015 and intended to be effective June 19, 2015 ("**Wallace Agreement**") and attached here as **Exhibit A**. On November 10, 2015, pursuant to the Wallace Agreement, ARB invoiced FPS for Mr. Wallace's services for the month of October; and

WHEREAS, the Parties have entered into this Agreement in order to avoid the time, expense and distraction of arbitration and/or litigation and to resolve all of the foregoing matters on the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, intending to be legally bound, the Parties agree as follows:

1. AMEX Balance. (a) The CPP Parties jointly and severally agree to pay the full Amex Balance, including without limitation any and all accrued and unpaid interest, penalties or other charges assessed by American Express with respect thereto, as follows:

(i) one initial payment of $20,000 prior to or upon execution and delivery of this Agreement;

(ii) one additional payment of $20,000 on or before December 31, 2015; and

(iii), one final payment of the full remaining balance on or before January 31, 2016.

(b) In addition, CPS agrees to defend, indemnify and hold harmless Mr. Halloran from and against any claims that may be asserted against him for payment of any portion of the Amex Balance, with the understanding and agreement that Mr. Halloran is an intended third party beneficiary of this Agreement.

(c) FPS and CPS acknowledge that their obligation to pay the full Amex Balance is not disputed.

2. Other Claims. In consideration of the mutual releases hereinafter set forth, the CPP Parties jointly and severally agree to pay ARB and ARB agrees to accept an amount equal to $105,000 (the "**Settlement Payment**"), as hereinafter provided. The Parties acknowledge and agree that the Settlement Payment is intended to satisfy in full the aggregate amount of the CPP Parties' payment obligations to ARB with respect to both ARB's Net Share and reimbursement for Mr. Wallace's services through September 30, 2015, after netting against such amounts the full aggregate amount of the CPP Claims. The Parties further acknowledge that the agreement by the CPP Parties to make the foregoing payment and the agreement by ARB to accept such payment in satisfaction of its claims represent a substantial compromise by the Parties with respect to the asserted value of their respective claims. The CPP Parties will pay the Settlement Payment in monthly installments of at least $10,000 each, beginning no later than February15, 2016, with the

full balance thereof due and payable no later than May 31, 2016. Such payment obligations will be evidenced by a Promissory Note of CPP in the form attached hereto as **Exhibit B** (the "**Note**"), and this Agreement is expressly conditioned on CPP executing and delivering the Note to ARB upon execution and delivery of this Agreement. As a further condition to the effectiveness of this Agreement, upon execution and delivery of this Agreement the CPP Parties will pay to ARB the accrued and unpaid balance of the outstanding invoices for Mr. Wallace's services for October and November.

3. Subject to section 14 below, in exchange for and subject to payment in full of the Settlement Payment and the promises made by and between the Parties herein, the ARB Parties, on behalf of themselves and their respective predecessors, successors, assigns, past and present officers, members, shareholders, managers, directors, employees, agents and representatives, hereby fully, finally and forever release and discharge the CPP Parties and their respective predecessors, successors, assigns, past and present officers, members, managers, employees, agents and representatives, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, security interests, contracts (oral and/or written), agreements, promises, liabilities, guarantees, claims, demands, damages, losses, costs or expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which any of them anytime heretofore has had, owned or held, or now has, owns or holds against the CPP Parties or any other person or entity referred to above by reason of any matter, cause, fact, thing, act or omission whatsoever arising out of, based upon, or relating to any matter or event concerning the Investment Agreement and the CPP Equity Contribution Agreement (as defined in the Investment Agreement and the CPS Equity Contribution Agreement (as defined in the Investment Agreement), including without limitation the calculation of ARB's Net Share and any and all of the other matters enumerated above, from the beginning of time through the date of this Agreement, but excluding;

(i) any claims, rights or causes of action arising under this Agreement; and

(ii) any and all rights of ARB as an owner of Class B-1 Units (non-voting) in FPS.

Nothing in this section 3 or elsewhere in this Agreement is intended to revive, continue or otherwise reinvigorate any Intercompany Claim (as defined in the Investment Agreement) settled, discharged and released pursuant to the General Release (as defined in the Investment Agreement).

4. Subject to section 14 below, in exchange for foregoing releases and the promises made by and between the Parties herein, the CPP Parties, on behalf of themselves and their respective predecessors, successors, assigns, past and present officers, members, managers, employees, agents and representatives, hereby fully, finally and forever release and discharge the ARB Parties and their respective predecessors, successors, assigns, past and present officers, members, shareholders, managers, directors, employees, agents and representatives, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, security interests, contracts (oral and/or written), agreements, promises, liabilities, guarantees, claims, demands, damages, losses, costs or expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which any or all of them anytime heretofore has had, owned or held, or now has, owns or holds against the ARB Parties or any other

person or entity referred to above by reason of any matter, cause, fact, thing, act or omission whatsoever arising out of, based upon, or relating to any matter or event concerning the Investment Agreement, including without limitation the CPP Claims (and the asserted claims against FW and EUI underlying the CPP Claims) and any and all of the other matters enumerated above, but excluding any claims, rights or causes of action arising under this Agreement.

5. The Parties acknowledge and agree that the releases given by a Party under this Agreement are made expressly contingent on compliance by the other Party with the terms and conditions of this Agreement, including with respect to the CPP Parties, timely payment in full of the Amex Balance and the Settlement Amount. If at any time or for any reason the CPP Parties fail to make any payment of the Amex Balance or the Settlement Amount on the applicable payment dates set forth above or in the Note, and such failure continues for a period of three (3) business days after e-mail or other written notification from ARB, then in any such event all payment obligations of the CPP Parties under this Agreement and the Note shall be accelerated and become immediately due and payable, and in addition to any and all other remedies available to ARB at law or in equity, ARB shall have the right and option to rescind this Agreement, including without limitation the releases set forth above, and proceed against the CPP Parties as if this Agreement had never been signed, provided in that event any amounts previously paid hereunder will be credited against the amount of its claims. It is expressly understood and agreed that in such event ARB's claims will not be limited to collecting the remaining balance of the Settlement Amount and/or the Amex Balance, but will include all amounts ARB has previously claimed to be due and payable, and may be brought against any one or more of the CPP Parties. If ARB elects to rescind this Agreement as aforesaid, then the CPP Parties shall likewise have the right to renew the CPP Claims on the same basis.

6. The Parties each agree to maintain in confidence the existence of this Agreement, the contents and terms of this Agreement, and the consideration for this Agreement (hereinafter collectively referred to as "**Settlement Information**"), except as may be required to enforce the terms hereof, and provided further that any Party may disclose the Settlement Information solely to those employees, officers, attorneys, accountants, and governmental entities who have a reasonable need to know of such Settlement Information.

7. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

8. This Agreement may not be assigned by any Party without the prior written consent of the other Parties. This Agreement shall be binding on and inure to the benefit of the Parties and their respective, successors and permitted assigns. For purposes of this Agreement, any person or entity referred to in the releases set forth in sections 3 or 4 above and not Parties to this Agreement shall be deemed to be third party beneficiaries of such releases.

9. This Agreement sets forth the entire agreement between the Parties and supersedes any prior agreement(s) or understanding(s) between the Parties with respect to the subject matter hereof.

10. This Agreement may not be modified, except upon express written consent of all the Parties.

11. All Parties to this Agreement agree that they have been given a reasonable period of time to consider the terms of this Agreement, that they have had the opportunity to review the terms of the Agreement with legal counsel and that they understand and acknowledge the effect of signing this Agreement.

12. Each of the Parties represents and warrants that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein, and affirms that no such claims or causes of action have been assigned or transferred to any other person or entity.

13. This Agreement shall be governed by the laws of the State of Delaware without regard to its conflict of laws provisions.

14. All future services provided by a CPP Party to an ARB Party or by an ARB Party to a CPP Party (including services provided pursuant to the Wallace Agreement as well as any contracted services provided by FPS to ARB or any of its affiliates) will be paid pursuant to the terms of the underlying service contracts).

15. ARB shall use its commercially reasonable efforts to execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as may be necessary to consummate the transactions contemplated by the Investment Agreement, including such actions at ARB's expense as are necessary in connection with:

(i) obtaining any third-party consents and all Governmental Approvals required to be obtained by ARB; and

(ii) transferring assigning and conveying the Assets (as defined in the Investment Agreement) to, and ratifying and confirming ownership of the Assets in, FPS.

(iii) [*remainder of page intentionally left blank*]

SIGNATURE PAGE FOR CPP PARTIES
TO SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release has been executed by the Parties, to be effective as of the date set forth above.

Frontier Pro Services, LLC

By: _____
Name: Joseph C Lerner
Title: Manager

Cycle Power Services LLC

By: _____
Name: Joseph C Lerner
Title: Managing Partner

By: _____
Name: Peter P Blood
Title: Managing Partner

Cycle Power Partners, LLC

By: _____
Name: Joseph C Lerner
Title: Managing Partner

By: _____
Name: Peter P Blood
Title: Managing Partner

SIGNATURE PAGE FOR CPP PARTIES
TO SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release has been executed by the Parties, to be effective as of the date set forth above.

Frontier Pro Services, LLC

By: _____
Name:
Title:

By: _____
Name: Peter P Blood
Title: Manager

Cycle Power Services LLC

By: _____
Name:
Title:

By: _____
Name: Peter P Blood
Title: Managing Partner

Cycle Power Partners, LLC

By: _____
Name:
Title:

By: _____
Name: Peter P Blood
Title: Managing Partner

Page 6 of 14--Blood

EXHIBIT A, p. 6B of 14

SIGNATURE PAGES FOR ARB PARTIES
TO SETTLEMENT AGREEMENT AND GENERAL RELEASE

American Refining and Biochemical, Inc.

By: *[signature]*
Name: Kathryn E. Coffey
Title: President and COO

Frontier Wind, LLC

By: *[signature]*
Name: Harry R. Halloran, Jr.
Title: CEO and Chairman

Energy Unlimited, Inc.

By: *[signature]*
Name: Harry R. Halloran, Jr.
Title: CEO and Chairman

Page 7 of 14

# EMPLOYEE LEASE AGREEMENT

THIS EMPLOYEE LEASE AGREEMENT (this "Agreement") is dated October 1, 2015 but intended to be effective as of the 19th day of June, 2015 (the "Effective Date"), by and between AMERICAN REFINING AND BIOCHEMICAL, INC. ("ARB"), and FRONTIER PRO SERVICES, LLC ("FPS").

## RECITALS

WHEREAS, FPS is engaged in the business of servicing wind turbines and ARB, a member of FPS, currently employs Jack Wallace (the "Employee") who has extensive experience with FPS and its business; and

WHEREAS, FPS has a need for services the Employee is qualified to perform (the "Services"), on a part-time basis, and ARB has made a portion of the Employee's time and services available to FPS at FPS's direction since the Effective Date, and is willing to continue to do so under a "leased employee" arrangement, upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, incorporating the foregoing recitals herein and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Services</u>. Continuing from the date hereof until this Agreement is terminated as hereinafter provided, and subject always to FPS's payment obligations hereunder, ARB shall continue to make available to FPS the Services on a monthly basis, for that number of hours representing seventy-five percent (75%) of the Employee's normal work month. The Employee will provide the Services to FPS at such times and places as may be determined by FPS, provided that FPS's use of the Services does not unreasonably interfere with ARB's use of the Employee's services for the remaining 25% of the work month. The parties acknowledge that ARB is also engaged in wind energy related operations, and the services the Employee provides to ARB and FPS will be similar in nature.

2. <u>Supervision and Control by FPS</u>. FPS shall be responsible for the supervision and control of the Employee during such times as he is providing the Services on behalf of FPS.

3. <u>Facilities, Supplies and Equipment</u>. FPS shall be responsible for providing the facilities, supplies and equipment for use by the Employee in providing the Services to FPS.

4. <u>Lease Fee</u>.

    (a) In consideration for the Services provided by the Employee from the Effective Date through the date hereof and continuing hereafter, FPS agrees to pay to ARB: (i) immediately upon execution of this Agreement, a lump sum payment of $28,217.03, representing 75% of the Employee's Compensation (as hereinafter defined) during the period from the Effective Date through the date hereof; and (ii) a continuing lease fee (the "Lease Fee") equal to 75% of the total amount of the compensation, payroll taxes and benefits (with the exception of

matching 401k contributions) paid by ARB to or on behalf of the Employee or otherwise in connection with his employment during the term of this Agreement (collectively, "Compensation"), which the parties acknowledge results in an initial Lease Fee of $8,151.59 per month. The determination of the Lease Fee shall be based on the actual compensation paid by ARB, provided ARB will not make any material change in the Employee's compensation without first giving FPS at least thirty (30) days prior notice thereof.

(b) Within ten (10) days after the end of each calendar month, beginning with the month of October, 2015, ARB shall forward to FPS an invoice for the Lease Fee for such month calculated as aforesaid and supported by appropriate documentation. FPS shall submit payment in accordance with each invoice within five (5) days after its receipt of the invoice.

(c) In addition to the foregoing, the parties acknowledge that FPS currently pays the Employee commissions for certain services performed not included in the Services. To the extent FPS continues to pay the Employee such commissions, it will pay them directly to the Employee and will issue him a 1099 for any such payments.

5. <u>Term and Termination</u>.

(a) This Agreement shall continue in effect on a month to month basis until terminated as herein provided.

(b) This Agreement may be terminated by either party upon at least thirty (30) days prior written notice to the other.

(c) This Agreement may be terminated by ARB immediately and without notice if FPS fails to make any payment to ARB required herein within five (5) days following the applicable due date.

(d) Unless otherwise agreed to by the parties in writing, this Agreement shall automatically terminate upon the occurrence of any of the following events:

(i) the bankruptcy, insolvency or dissolution of either party;

(ii) a change in applicable law, regulation or government policy that has a material adverse impact on the ability of either party to perform its obligations hereunder; provided that the parties first attempt in good faith to restructure this Agreement to comply with any such law, regulation or policy; or

(iii) the expiration or termination, for any reason, of the Employee's employment with ARB.

(e) This Agreement may also be terminated without notice upon the mutual written agreement of the parties.

6. <u>Governing Law</u>. This Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of California, without regard to conflicts of laws principles.

- 2 -

Page 9 of 14

EXHIBIT A, p. 9 of 14

7. Entire Agreement; Amendments.  This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements and understandings between the parties with respect to such subject matter.  No amendments, variations, modifications or changes herein or hereof shall be binding upon either party hereto unless set forth in writing and duly executed by both parties.

8. No Third Party Beneficiary.  The parties expressly agree that the Employee is not intended to be a third party beneficiary of this Agreement in any respect, and nothing contained herein shall constitute an agreement of any kind between the Employee and ARB or FPS, or alter in any respect the Employee's status as an employee-at-will with ARB.

9. Waiver.  No consent or waiver, express or implied, by either party to or of any breach or default by the other in the performance by the other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligations of such party hereunder.  Any such waiver shall be effective only if in writing.  Failure on the part of either party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

10. Severability.  If any provisions of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

11. Compliance with Laws.  Each party shall at all times comply, and use its respective best efforts to assist the other in complying, with all applicable laws, rules, regulations and policies of governmental authorities.

12. Binding Agreement; Assignment.  This Agreement shall inure to the benefit of and be binding upon the undersigned parties and their respective successors and permitted assigns.  Neither party may assign any of its rights or obligations under this Agreement to any other person or entity without the prior written consent of the other party hereto.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

AMERICAN REFINING AND
BIOCHEMICAL, INC.

By: /s/ Kathryn E. Coffey
Name: Kathryn E Coffey
Title: President and COO


FRONTIER PRO SERVICES, LLC

By: /s/ Paul Baker
Name: Paul Baker
Title: General Manager

PROMISSORY NOTE

$105,000.00                                                        Date of Issue: December 9, 2015

FOR VALUE RECEIVED, the undersigned CYCLE POWER PARTNES, LLC, a Delaware limited liability company ("Maker"), with a mailing address at:

> Cycle Power Partners, LLC
> Attn: Managing Partner
> 24 NW First Avenue, Suite 275
> Portland, OR 97209
> Phone: 503-281-6034
> Fax: 503-296-2551
> Email: peter@cyclepowerpartners.com

promises to pay to AMERICAN REFINING AND BIOCHEMICAL, INC., a Pennsylvania corporation with a mailing address of 100 Four Falls Corporate Center, Suite 215, West Conshohocken, PA 19428 ("Payee"), or at such other address as Payee may designate from time to time in writing, the principal sum of ONE HUNDRED AND FIVE THOUSAND AND NO CENTS Dollars ($105,000.00) ("the Principal Sum") lawful money of the United States of America, payable as hereinafter provided. This note (this "Note") is the promissory note of Maker referenced in section 2 of the Settlement Agreement and General Release effective as of December 9, 2015 (the "Settlement Agreement") between Maker and Payee, among others. Capitalized terms not otherwise defined herein shall have the meanings given them in the Settlement Agreement. This Note evidences the obligation of Maker to pay the Settlement Amount.

1. <u>Interest; Payment Terms; Mandatory Prepayment</u>.

(a) This Note shall bear interest on the outstanding principal balance at a fixed rate equal to twelve percent (12%) per annum.

(b) Principal and accrued interest shall be paid in t monthly installments of at least $10,000.00 each beginning on January 29, 2016 and continuing thereafter on each February 29, 2016, March 31, 2016, April 29, 2016 and May 31, 2016. All theretofore unpaid principal of, and interest on this Note, shall be dull in full on May 31, 2016  "Maturity Date"). Payments shall be applied **<u>first</u>** to interest **<u>then</u>** to principal.

(c) Maker shall have the right at any time to prepay all or any portion of the unpaid principal balance of this Note.

(d) Any prepayment, whether voluntary or involuntary, shall be applied to the principal installments due under this Note in the inverse order of their maturity.

2. <u>Events of Default</u>. The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>" hereunder:

(a) Maker shall fail to make any payment due under this Note within ten (10) business days following the date the same shall become due and payable, whether at maturity or by acceleration or otherwise; or

(b) Maker shall apply for or consent to the appointment of a receiver, trustee or liquidator of itself or any of its property, make a general assignment for the benefit of creditors, be adjudicated a bankrupt, insolvent or file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or if action shall be taken by the Maker for the purpose of effecting any of the foregoing; or any order, judgment or decree shall be entered by any court of competent jurisdiction, appointing a receiver, sequestrator, trustee or liquidator of the Maker or any of its property, and such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) consecutive days.

3. <u>Remedies</u>. Upon the occurrence of an Event of Default, the entire unpaid principal sum hereunder and all accrued interest shall, at the option of Payee, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, all of which are hereby expressly waived by Maker. In addition to the foregoing, upon the occurrence of any Event of Default Payee may forthwith exercise singly, concurrently, successively or otherwise any and all rights and remedies available to Payee under this Note, or available to Payee by law, equity, statute or otherwise. Maker agrees to pay Payee on demand such amounts as are necessary to reimburse Payee in full for its costs (including reasonable attorneys' fees) for legal process or proceedings to secure, enforce or collect any and all sums due hereunder.

4. <u>Miscellaneous</u>.

(a) The failure by Payee to exercise or delay in exercising any right or remedy hereunder, or the failure to insist upon strict performance of any term of this Note shall not be construed as a waiver or release of the same, or of any event of default thereunder, or of any obligation or liability of Maker hereunder.

(b) Maker hereby waives presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, all amounts due under this Note. To the extent permitted by law, Maker waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. Maker further waives and releases all procedural errors, defects and imperfections in any proceedings instituted by Payee under the terms hereof.

(c) Maker agrees that Payee may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of this Note (and Maker hereby waives any notice of

any of the foregoing), and that the same may be amended, supplemented or modified by Payee and the other signatory parties, and any action taken by Payee pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of Payee, or of any Event of Default, or of any liability or obligation of the Maker, under this Note.

5. <u>Severability</u>. If for any reason one or more of the provisions of this Note or their application to any Person or circumstance shall be held to be invalid, illegal or unenforceable in any respect or to any extent, such provisions shall nevertheless remain valid, legal and enforceable in all such other respects and to such extent as may be permissible. In addition, any such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6. <u>Successors and Assigns</u>. This Note inures to the benefit of Payee and binds Maker, and their respective heirs, personal representatives, successors and assigns, and the words "Payee" and "Maker" whenever occurring herein shall be deemed and construed to include such respective heirs, personal representatives, successors and assigns, as applicable. Notwithstanding the foregoing, Payee shall not be entitled to assign its rights hereunder without the consent of Maker, which consent may be withheld in Maker's absolute discretion.

7. <u>Notices</u>. All notices required to be given to any of the parties hereunder shall be deemed to have been sufficiently given for all purposes when delivered in accordance with the notice provisions of the Agreement.

8. <u>Captions</u>. The captions or headings of the paragraphs in this Note are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Note.

9. <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its rules of conflict of laws.

IN WITNESS WHEREOF, Maker has executed this Promissory Note on the Issuance Date first above written.

CYCLE POWER PARTNERS, LLC

By: /s/ Joseph C. Lerner
Joseph C. Lerner
Managing Partner